UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

CATHERINE A. MOBLEY,                )
          Plaintiff,                )
                                    )
    vs.                             )        1:04-cv-1430- SEB-VSS
                                    )
ALLSTATE INSURANCE COMPANY          )
a/k/a ALLSTATE PROPERTY AND         )
CASUALTY INSURANCE COMPANY,         )
          Defendant.                )


## <u>ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

This is a disability discrimination case brought under the Americans with Disabilities Act ("ADA").[1]  It is before the court on a motion for summary judgment filed on behalf of the Defendant, Allstate Insurance Company ("Allstate").  For the reasons discussed in this entry, we find merit in the motion and shall enter summary judgment in favor of Allstate.

### *Factual Background*

Plaintiff, Catherine Mobley, began working for Allstate in September of 1987.  She initially worked in customer service but received promotions and eventually became a Staff Claims Service Adjuster in Allstate's claims facility

---

[1]Plaintiff also set forth an alternative claim of age discrimination in her complaint; however, she has voluntarily conceded that claim in response to the summary judgment motion filed by the Defendant.

near Indianapolis until her employment was terminated in October 2003, along with 31 other claims service employees in the region. She believes that she was terminated in violation of the Americans with Disabilities Act ("ADA") either because of her disability or because she had been placed in a performance improvement plan in retaliation for her pursuit of an accommodation for her disability.

Allstate's Indianapolis facility is part of a three state region known internally as the Crossroads CSA Region. Alexandra Balatsoukas is in charge of the day-to-day operations at Allstate's Indianapolis facility, overseeing a location with approximately 75 to 85 employees. Six Front Line Performance Leaders ("FPL's") report directly to Balatsoukas. Mobley was an adjuster in the Represented Unit which handles claims involving bodily injury where the injured party is represented by counsel. Her processing duties included investigation, evaluation and resolution of those claims through negotiation, arbitration, mediation or trial. Her additional daily tasks included handling telephone inquiries specific to her files as well as general claims telephone inquiries which get parsed out pro rata among the adjusters. She reported directly to her FPL, Nancy Brechbuhl.

In 2001, Mobley was assigned to handle her unit's uninsured and underinsured ("UM/UIM") claims. She was the only person who processed

those claims within the unit, unless a back-log developed.  Allstate regards UM/UIM claims as a bit more time sensitive and difficult to process.

In March of 2001, Mobley was permitted an approved disability leave for depression.  While on leave she began experiencing tremors and involuntary muscle jerks.  Her doctor diagnosed her condition as suffering from essential tremor.  Mobley returned to work in July of 2001 but found it hard to concentrate and stay awake at work.  She continued to seek medical assistance for her ongoing problems as the quality of her work performance began to deteriorate.

Prior to 2001, Mobley had always received satisfactory performance reviews.  In October of 2001, she received her first subpar review and was placed on "Requires Improvement" or "RI" status.  Allstate sets numeric goals with respect to the quality and quantity of work that adjusters are required to perform.  An FPL reviews the files of an adjuster to determine whether he or she is meeting the established performance goals, and those who meet their goals are ranked either as "meets" or "exceeds."  Those who do not are placed on a performance improvement plan, referred to as "RI."  While on RI status, an employee receives 30, 60 and 90-day follow-up reviews to determine if progress has been made to a point where the employee is meeting expectations with respect to her goals.  If the employee does not make the "meets" level by the 90-day RI follow-up, that employee's status is labeled as "Job in Jeopardy" or "JIJ"

status.  If, after another cycle of 30, 60 and 90-day follow-up reviews, the employee still has not improved to the point of "meets" status, standard procedure dictates termination of the person's employment.

Following the October 2001 review, Mobley's next review occurred in December of 2001.  That review again found her performing at less than an acceptable level.  Three months thereafter, in March of 2002, Mobley received an annual review which characterized her performance as "not meeting the accountabilities" of her position.  The next evaluation in June of 2002 brought another substandard result, and Mobley was therefore placed on RI status in July of 2002.  About that same time, Mobley underwent a sleep study ordered by her doctor, which led to a diagnosis of nocturnal myoclonus, a major symptom of which is difficulty staying asleep due to involuntary body jerks, in conjunction with her essential tremor.  Mobley's difficulty sleeping at night caused her problems in staying awake and focusing at work.  After she was put on RI status, Mobley described her ongoing health problems and their impact on her work to both Brechbuhl and Debbie Lee, who worked in Human Resources.

A few months later, in the fall of 2002, Mobley approached Brechbuhl with a proposal that she be allowed to work only on bodily injury evaluations for her unit in order to allow her to improve her performance by limiting the expanse of her focus.  That request was denied.  However, another request

-4-

made by Mobley at about the same time was granted when she asked that she be allowed to work as needed in a walled-off conference room which had a door that could be closed; this space normally was set aside for special projects or work on complicated cases.  Without this accommodation, Mobley, like all other adjusters and each FPL, was required to work in a multi-person cubicle. Brechbuhl acceded to this request by Mobley and, according to Mobley, by moving to the privacy of the conference room, she was better able to focus. Mobley  gradually increased her use of the conference room over the ensuing weeks.  Eventually, she requested the conference room become her own private office space, which Brechbuhl permitted, at least temporarily.  However, after noticing Mobley's continued presence in the conference room, Balatsoukas approached Brechbuhl, stating that, because of employee equality issues, Mobley should return to her space in a cubicle to work with the other adjusters.

A bit later, in October of 2002, in response to her RI status follow-up review, Mobley submitted nine pages of medical records with her review forms and indicated that she had begun to feel better under the most recent changes to her pharmaceutical regimen.  In a follow-up meeting with Balatsoukas on November 18, 2002, Mobley confirmed, for the first time, her diagnosis of essential tremor and myoclonus but assured her supervisor that she would soon return to a "meets" or "exceeds" level as soon as her backlog of files was cleared out.  Mobley claims that, when asked what might be done to assist her

in meeting that goal, she mentioned working in a quiet environment, working from home for a day each week, or working only on bodily injury evaluations. Mobley asserts that, in response, Balatsoukas told her that she would have to "do the work like anyone else" or she and Allstate would part company. Balatsoukas reports she informed Mobley about "Life Works," a program provided by Allstate through an outside vendor for employees coping with various types of personal and professional difficulties. She also says that she told Mobley that, if her performance did not improve within 90-days, Balatsoukas would recommend termination, but that, if noticeable improvement were shown in the 90-day period, she would consider extending the JIJ period which at that time was just beginning for Mobley.

Toward the end of November, Mobley was informed that she could return to working alone in the conference room. According to Mobley, Brechbuhl told her that Balatsoukas had decided to let her return to the conference room in part to prove that Mobley's poor performance was due to her own lack of effort as opposed to any need for a quiet environment. However, in the solitude of the conference room, by the end of January, Mobley had improved her performance to the point that she again achieved "meets" status.

At Mobley's request, on February 28, 2003, Mobley's neurologist filled out an Allstate form entitled "Certificate of Health Care Provider." The form, along with another corresponding form which Mobley herself completed,

indicated the submissions were for the purpose of supporting consideration for a request for leave under the Family Medical Leave Act.  In addition to completing the FMLA forms, Mobley's neurologist provided a written recommendation stating that Mobley would benefit from an altered work schedule of 10-hours-per-day on Monday, Tuesday, Thursday and Friday, thus allowing her to sleep and rest on Wednesdays.  Mobley had discovered that she was more productive at the beginning of the work week, which her doctor explained was likely because she was able to get more sleep over the weekends; thus she would benefit from some type of break in the work schedule at mid-week.  She provided the forms along with the doctor's recommendation to Allstate.

During the first week of March 2003, Balatsoukas met with Mobley to confirm her "meets" status and to advise her that she would be put back on JIJ status if she did not maintain a "meets" rating going forward.  Balatsoukas also informed Mobley at this meeting that, since she was no longer in JIJ status, she would need to return to her workstation in the multi-person cubicle. Mobley in turn informed Balatsoukas that she had obtained Family Medical Leave Act ("FMLA") documentation from her doctor, and Balatsoukas said she and the human resources people needed to review the documentation and that further accommodation of Mobley would be considered only after the further explanation from her doctor was reviewed by human resources.  Along with an explanation of her continuing irregular sleep problems, Mobley promised

additional documentation from her doctor.

In due course, Allstate received the documentation from Mobley's doctor, after which Balatsoukas again met with her and Brechbuhl, on March 21, 2003.  Balatsoukas informed Mobley that her doctor's suggestion of a four-day work week was not acceptable because, if she were not available on Wednesdays, others in her group would have to handle routine the phone calls on her files, and the group would be short one person to pick up roll over phone calls as they came into the office.  Balatsoukas maintains that she also told Mobley her presence was needed every work day in order to attend all scheduled mediations, arbitrations and other meetings.  Mobley denies being told anything about the need for her to attend meetings and asserts that such appointments would be easy to schedule on days other than Wednesdays. Balatsoukas did allow for some change in Mobley's schedule, however, advising Moblely that she could arrive at work later, at 9:00 a.m., and stay until 5:30 p.m.  This did not please Mobley because, as a salaried employee, she was already staying late in an effort to get all her work done and a later start time would cause her to have to stay even later into the evenings.  Balatsoukas encouraged Brechbuhl to try to ensure that Mobley left work by 5:30.  The files assigned to Mobley were also changed from being only the UM/UIM files to more typical casualty files.  Mobley did not want her performance to start to slip again and felt that the change in file assignments by Balatsoukas would not help the situation.  Balatsoukas told Mobley that her problem was not an

-8-

FMLA issue since she was not missing any time.[2]

Sometime shortly after the March 21, 2003, meeting, Mobley made a call to the telephone line Allstate has established to handle various employee complaints, known as the "resolution line." As a result of that phone call, Allstate human resources employees Sybil Brenner and Debbie Williams were assigned to obtain more information and process Mobley's complaint. Mobley provided additional documentation from her doctor, including a statement that she would benefit from working in a room by herself. This recommendation prompted Allstate to allow Mobley to return to work in the conference room. In addition, a number of her backlogged files were transferred to other adjusters. However, her performance for the month of April remained below the "meets" standard, and she was told that she must show improvement by June, though she was not immediately put back on JIJ status despite Balatsoukas's warnings to that effect.

Despite her having continued permission to work out of the conference room, Mobley's performance never reached "meets" status again. Mobley asserts that this may have been due in part to the frequent requests by Balatsoukas and Brechbuhl that she leave work at 5:30 p.m. even though, historically, she had needed to work more than forty hours a week in order to

---

[2]Mobley's FMLA paperwork did request FMLA leave for a week in February of 2002 due to a reaction to adjustments to her medication, and she was granted FMLA leave.

complete her work.  By mid-summer, she had begun to take work home with her in order to improve her performance evaluations.  When the results for June 2003 revealed that Mobley still had failed to demonstrate adequate improvement, she again was placed on RI status, and on September 9, 2003, an RI review disclosed that she had failed to achieve "meets" status.  Mobley testified that sometime in September she was told by Brechbuhl that she was getting close to meeting the performance goals.

On October 23, 2003, Allstate undertook a reduction in force ("RIF") which resulted in the termination of 32 Allstate employees in the CSA Crossroads Region, including Mobley.  The methodology Allstate used in choosing those who were to be let go as a part of the RIF involved an assessment of business needs and employee performance ratings.  All of the 32 individuals who were notified that they were subject to the RIF were listed on a report created by human resources employee Brenner on October 7, 2003, which included the names of all employees Brenner believed were on RI status at the time.  Earlier, in September, she had begun preparing the list of the names of individuals whom she understood were on RI status, based on the performance ratings of all employees in the CSA Crossroads Region.

Because of a reduction in the number of claims being handled in the region during 2003, upper management at Allstate decided that the region needed eventually to eliminate a total of 105 positions.  The decision to reduce

employment in the region by the initial 32 positions through a RIF in October was made by Brenner and Kathleen Mahne, Allstate's Claim Field Director, both of whom believed they could achieve the targeted total reduction of 105 sometime thereafter through retirements and normal attrition.

After filing an EEOC charge and receiving her right to sue letter, Mobley brought this lawsuit claiming that Allstate failed to accommodate her disability and terminated her employment either because of her health problems or because she sought an accommodation and complained when only a limited accommodation was provided by Allstate.

### Summary Judgment Standard

On a motion for summary judgment, the burden rests on the moving party to demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). After the moving party demonstrates the absence of a genuine issue for trial, the responsibility shifts to the non-movant to "go beyond the pleadings" and point to evidence of a genuine factual dispute precluding summary judgment. Id. at 322-23. "If the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court must enter summary judgment against her." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986);

*Celotex*, 477 U.S. at 322-24; *Anderson*, 477 U.S. at 249-52).

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge*, 24 F.3d at 920. Therefore, in considering a motion for summary judgment, we take the facts and draw all reasonable inferences in favor of the non-movant. *Venters v. City of Delphi*, 123 F.3d 956, 962 (7th Cir. 1997). If genuine doubts remain, and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir.1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir.1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Waldridge*, 24 F.3d at 920.

### *Discussion*

### *A.    Failure to Accommodate*

The ADA protects from discrimination those with disabilities and those who are perceived as disabled. It forbids discriminatory acts and imposes a duty upon employers who know of a disabled employee's physical or mental limitations to provide reasonable accommodation to allow the employee to continue working. 42 U.S.C. § 12112(b)(5)(A). A reasonable accommodation

"may include ... (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9).  Such accommodations are required unless they would cause the employer undue hardship.  42 U.S.C. § 12112(b)(5)(A).

Mobley argues that Allstate failed to engage in an "interactive process" to determine the appropriate accommodation for her and failed to provide the accommodations she and her doctor specifically suggested.   Her requests to work from home or to maintain a four-day work schedule were denied.  She also was not allowed to work solely on certain types of bodily injury files that better held her focus.  Mobley takes issue as well with Allstate's denial to her of the exclusive use of the conference room after she had demonstrated an ability to perform adequately in such an environment.

To establish a claim for failure to accommodate, Mobley must show that: (1) she is a qualified individual with a disability; (2) Allstate was aware of her disability; and (3) Allstate failed to reasonably accommodate her disability. *E.E.O.C. v. Sears, Roebuck & Co.,* 417 F.3d 789, 797 (7th Cir. 2005).  To be considered "qualified" an individual must be able to perform the essential functions of her position with or without a reasonable accommodation.  42

-13-

U.S.C. § 12111(8); *Darnell v. Thermafiber, Inc.,* 417 F.3d 657, 659-660 (7th Cir. 2005).  Allstate argues that it did accommodate Mobley and that her performance demonstrated that, even with an accommodation, she could not perform the essential functions of her position.

There is no dispute that Mobley had an acceptable record of performance up to the point that her sleep deprivation and essential tremor medication regimen caused in her a reduced capacity to focus.  After those conditions presented, she was provided the accommodation of working alone in the conference room, and it appears, based on that change, she met the requirements of her position, at least for short periods of time.  However to accomplish the production goals, she was required to take work home to complete there and often worked extended hours at the office and also transferred some of her backlog of files to others.  We defer discussion of Mobley's capacity to perform the essential functions of her job until further on in this entry, while noting at this point in our analysis simply that whether she was a "qualified individual" under the Act remains a question of fact because there is at least some evidence that she was capable of performing her job with an accommodation during the time period when she sought an accommodation.

That said, we conclude on the basis of the evidence adduced in connection with defendant's motion for summary judgment that Allstate did

-14-

accommodate Mobley in accordance with its obligations under the ADA, which statute imposed on Allstate the obligation to address any need of which it was aware by making an accommodation, if possible, based upon Mobley's physical or mental limitations.  The evidence establishes that until late summer 2002, when Mobley informed Brechbuhl and Lee that she was experiencing health problems, Allstate had no reason to know that Mobley might have some type of mental or physical limitation.  Even when information was presented by Mobley to Allstate supervisors, there was no basis on which to assume that her condition caused her to suffer a disability of the sort that required the removal of some job related barrier to her satisfactory performance.  Not until the Fall of 2002 did Mobley approach Brechbuhl with the proposal that she might be able to work more effectively and efficiently if she were left to work alone in the conference room.  When faced with this proposed accommodation, neither Mobley nor Allstate considered Mobley's request as one related to a disability, that is, a permanent or long-term limitation on a major life activity.  *Toyota Motor Mfg., Kentucky, Inc.*, 534 U.S. 184, 195-96 (2002).  Even later on, when Mobley filled out the FMLA forms and discussed them with her supervisors, all involved apparently viewed Mobley's problems as temporary.

Mobley argues that Allstate failed to engage in the required "interactive process" toward the goal of finding and making a reasonable accommodation.  However, the evidence adduced by the parties on summary judgment does not support that claim.  Even though it required a second request by Mobley to

secure the requested accommodation, Mobley eventually was allowed to use the conference room as her private office in order to insulate her from workplace distractions.  This accommodation was provided in lieu of her alternative request to work from home one or two days a week, and this accommodation led, at least temporarily, to her performance improvement.  In January 2003, when she was directed to return to the general work area after achieving "meets" status, no one, including Mobley, regarded her loss of focus as anything other than a temporary problem for which either a cure or pharmaceutical relief was being pursued by her and was deemed possible.

Though Mobley, and perhaps someone at Allstate as well, may have mischaracterized her situation as coming within the protections of the FMLA, that mistake was identified early on, prompting Mobley to bring in suggestions from her doctor with respect to possible accommodations to help her improve her faltering performance and return to acceptable levels.  In response to the specific inquiry regarding what accommodation Mobley required, her doctor responded with two points:  (1) Mobley would benefit by being in a room by herself to help her concentrate; and (2) working ten hours for four days a week, with Wednesday off, would assist.  Both Mobley and Allstate interpreted these suggestions as alternatives.  Mobley disagrees with Balatsoukas's response that the mid-week day-off arrangement was unworkable because Mobley needed to be available at the office for mediations, arbitrations, trials and the like and to accept her share of general department phone inquiries,

maintaining that she could have been scheduled around Wednesdays off without a problem.  Further, Mobley contends that Balatsoukas merely voiced a concern about phone calls, which in Mobley's view was a minimal part of the job.  In the end, the accommodation alternative which had produced performance improvement previously, to wit, allowing Mobley to use the conference room as a private office, was again instituted by Allstate.  In addition, Mobley's backlog of files was reduced through reassignment of some of her cases to other employees, and she was allowed a later start time at the office to allow her to get more sleep.

Mobley did not like the accommodations which Allstate chose, but her disagreement is not controlling.  An employer is not required to provide the accommodation chosen or preferred by the employee. *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1116 (7th Cir. 2001).  Its obligation is to provide an accommodation that effectively addresses the employee's limitation. *Id.*; *E.E.O.C. v. Sears, Roebuck & Co.,* 417 F.3d at 802.  Here, Mobley's limitation was her diminished ability to concentrate and focus, due both to a lack of sleep and her pharmaceutical regimen, in response to which Allstate provided both the insulated, quiet work area as recommended by her physician and a delayed start time.  Allstate also eventually reassigned some of Mobley's files to other employees and reassigned Mobley to work on less demanding files.  Based on these actions, we find that Allstate did, in good faith, engage in the interactive process necessary to satisfy the requirements of the ADA.  *See Rehling v. City of*

*Chicago*, 207 F.3d 1009, 1015 (7th Cir. 2000).

Even if Allstate had refused to engage in an "interactive process", the failure to do so, without more, is not a violation of the ADA. *Id.* at 1015-16. The ADA requires an employer to ascertain if an accommodation is necessary for an employee to continue in or accept employment of a particular kind.  42 U.S.C. § 12112(b)(5)(A).  Generally, it is up to the employee to inform the employer of the disability, thereby triggering the employer's obligation to explore the possibilities or to "engage in an interactive process" aimed at reaching that end. *E.E.O.C. v. Sears, Roebuck & Co.,* 417 F.3d at 803-04.  The burden always remains on the employee to show that a reasonable accommodation existed which would have allowed her to continue performing her job.  *Mays v. Principi,* 301 F.3d 866, 870 (7th Cir. 2002)    Mobley has failed to provide any evidence to establish that any of her suggested alternative accommodations, to the extent they were reasonable,[3] would have allowed her to reach the "meets" level of performance required of all Allstate adjusters and, thereby, to perform the essential functions of her position.  Without this evidence, her failure to accommodate claim cannot succeed.

---

[3]In only the most extraordinary case would it be reasonable to expect an employer to allow an employee to work from home as an accommodation.  *Rauen v. U.S. Tobacco Mfg. Ltd. Partnership,* 319 F.3d 891, 896 (7th Cir. 2003).

**B.     *Discriminatory Termination***

Mobley's discriminatory termination claim lacks legal merit as well.  Like race and gender discrimination claims under Title VII, a claim of disparate treatment under the ADA may be proved by either the direct or indirect methods.  *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001).  In most cases, there is no direct evidence of discrimination, which is true here as well.  Mobley has relied on the burden shifting model set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) to prove her case indirectly.  That method requires a prima facie showing that: (1) Mobley is "disabled" within the meaning of the ADA; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse employment action; and, (4) similarly situated employees who were not disabled received more favorable treatment.  *Rooney v. Koch Air, LLC*, 410 F.3d 376, 380-81 (7th Cir. 2005).  Mobley's case falters at the second and fourth steps.

Unfortunately for Mobley, the fact that she was a good performer prior to the onset of her illness is of no consequence in this context.  The issue is whether she was able to perform the essential functions of her position at the time of the adverse employment decision.  *See Duda v. Board of Educ. Of Franklin Park Public School Dist. No. 84*, 133 F.3d 1054, 1060 (7th Cir. 1998).  Plaintiff has not challenged, nor we think could she reasonably do so, that reaching the "meets" standard is an essential function of her position.

Production at a certain speed or rate is a typical workplace measurement of whether an employee is adequately performing the essential functions of a position. *See Milton v. Scrivner, Inc.,* 53 F.3d 1118, 1124 (10th Cir. 1995). Nor does Mobley claim that the goals she was required to achieve were in any way more difficult than those imposed on others. Nor does Mobley's assertion that Brechbuhl had indicated that she was close to reaching "meets" standard immediately prior to the RIF does not get her over the hurdle. At the time of the decision regarding which employees would be included in the RIF, there is no dispute over the fact that Mobley was not performing up to her employer's standards, despite having been provided with the above referenced accommodations.

Further Mobley's claim that coworker Mike Hawkins was treated more favorably than she is unconvincing. While she has adduced some evidence to show that Hawkins was not subject to the RIF, despite having been on RI status during summer of 2003 and having year-to-date performance ratings which were lower than hers in many measured categories, she has not demonstrated that any of these statistical measurements provided the basis for Allstate's determination of whether an adjuster -- more specifically, Hawkins -- met the conditions of Allstate's RI status notifications. Neither has Mobley shown that Hawkins was on RI status at the time the RIF list was compiled.

Mobley responds by contending that during discovery she requested, but

never received, documents from Allstate regarding Hawkins's 2003 RI status and Allstate should not be allowed now to assert that Hawkins met requirements and had his RI status lifted since it failed to produce documents which would have allowed Mobley (and the court) to confirm what was required of Hawkins and whether it was equal to or greater than what was required of Mobley.  The time to challenge any lack of production of requested discovery is during the discovery period by filing a Fed.R.Civ.P. 37 motion on which the court can rule at the time it is made, not in a response or sur-reply to a dispositive motion.  Mobley's failure to raise this issue in a timely fashion removes it from our consideration in this context.

Even if Mobley's failures with respect to elements two and four of her required prima facie showing were not controlling of our analysis, it is also clear to the court that Allstate's explanation for the RIF and Mobley's inclusion in that group of employees to be let go provides a nondiscriminatory reason for her termination and is subject to no serious challenge as pretext.  In order to demonstrate pretext, a plaintiff in a discrimination case must show that her employer's articulated reason for terminating her employment either: (1) had no basis in fact, (2) did not actually motivate the employer; or, (3) was insufficient to motivate her discharge.  *Davis v. Con-Way Transp. Central Express, Inc.*, 368 F.3d 776, 784 (7th Cir. 2004).  And, citing the holding in Hudson v. Chicago Transit Authority, 375 F.ed 552, 561, the Seventh Circuit recently held: "In order to demonstrate a material issue of fact as to pretext

[plaintiff] much show that '1) it is more likely that a discriminatory reason motivated the employer than the proffered nondiscriminatory reason on 2) that an employer's explanation is not credible.'" Sublett v Wiley et al, (No.5-1213, 7th Cir. Jan. 6, 2006, J. Barker).  In other words, the focus is not on whether the decision was wise or well considered, but whether it was deceitful and intended to cover-up an illegal reason for the employer's action.  *Id.*

Mobley contends that there were individuals who were not subject to the RIF despite being on RI status and that there were other people who were subject to the RIF who were not on RI status.  Because of these discrepancies, she maintains there is sufficient evidence to question the articulated nondiscriminatory reason for her termination.  However, of the three employees she named as being on RI status at the time of the RIF who were not terminated, two attained that status after the RIF list was compiled on October 7, 2003, but before the implementation date which came at the end of the month.  The other employee worked in the Detroit fraud investigation unit, which unit was not subject to the RIF.  Obviously, these three employees were not similarly situated to Mobley.

Mobley's list of three employees who were subject to the RIF but were not actually placed on RI status until after the RIF list was compiled on October 7, 2003, is, we admit, a somewhat peculiar inconsistency, but not one which inures to Mobley's benefit.  These are individuals whose employment was

terminated in the same fashion as Mobley's, not employees who escaped the RIF and thereby received treatment more favorable than hers.  The evidence cited in support of the conclusion that these employees may not have been appropriately listed on the October 7 list consists of a copy of each RI Notification, but that list was not effectuated until October 14 or 20.  While we cannot explain why the names of these individuals appeared on the October report generated by Brenner, there is no evidence to establish that Brenner did not believe these employees were on RI status at that time and that their termination was consistent with all thirty-two individuals listed on the first page of that report.  Assuming a mistake on the part of Brenner, such an error would not necessarily reflect a discriminatory intent with respect to Mobley's termination.

Even more persuasive here is the extent of the efforts actually engaged in by Allstate in an apparent effort to ensure that it did not discriminate in undertaking the RIF.  The RIF-related documents submitted as evidence by both sides demonstrate an effort by Allstate to be fair and nondiscriminatory in its implementation.  For example, Allstate's human resources group reportedly attempted to assess in advance the impact of the RIF by reviewing the gender, age and minority status of each affected employee in a manner consistent with the actions of a company knowledgeable of the social and legal ramifications of its decisions and alert to the need to ensure that it complied with the actual and implied obligations attendant to a RIF.  Further, the decision to undertake

the RIF was made by upper level managers of Allstate who were located at a site other than the Indianapolis facility.  This evidence is not consistent with the picture Mobley attempts to paint of a local manager, Balatsoukas, who was looking for a way to get rid of or retaliate against her as a person whom she perceived to be a problem.  We find no basis in the record before us to view Mobley's employment termination as discriminatory.

## C.    *Retaliation*

Plaintiff's final claim is that she was subjected to retaliation by Allstate in response to her requests for accommodation of her disability.  Requesting an accommodation qualifies as protected activity, *see Isbell v. Allstate Ins. Co.,* 418 F.3d 788, 793 (7th Cir. 2005), but there is no evidence here that Mobley was treated less favorably than others who did not engage in protected activity, nor is there any other evidence that her requests for accommodation brought about her inclusion in the RIF.  *Id.*

Mobley argues that retaliation first occurred when she was returned to her regular multi-person working environment after she had attained "meets" status by using the conference room as her office.  She contends that because her request for accommodation, which was granted and later withdrawn, occurred within a few months time, the sequence of events and timing suffice to demonstrate a retaliatory motive on the part of Allstate.  We disagree with this contention for the reasons explained below.

First, during the latter part of 2002, neither Mobley nor Allstate was viewing Mobley's performance problems as evidence of a permanent or long-term impairment.  Instead, her medical situation was believed to be a temporary, treatable condition.  In 2003, when Mobley first produced reports and recommendations from her doctor, Allstate again accommodated her then documented need by permitting her to continue working alone in the conference room clear up to the time she was "RIF'ed."  Second, it is clear from the evidence before the court that Mobley was returned to her regular work space in January of 2003 because she had succeeded in achieving RI status, not because she had requested an accommodation.  Mobley admits this in her deposition.  Thus, there is no basis on which to infer retaliatory or discriminatory based on the shift(s) in her work environment at early 2003.

Neither can Mobley persuasively claim that she was placed on RI status (thereby making her eligible for the RIF) in retaliation for her requests for accommodation.  She admits that her performance levels fell below the expectations set for her in her specific position, and no issue has been raised regarding the manner in which her job performance was measured.  Per her request, she was at some point removed from responsibility for the UM/UIM files and allowed to work only on bodily injury files (a less taxing assignment, we are informed) and, in early 2003, despite another dip in her performance below acceptable levels, she was not placed immediately on RI status but was delayed that downgrading until the succeeding month.  Even then, she was

placed on RI status again, rather than dropped to the more critical JIJ status (which would have been the normal procedure); JIJ status would have made Mobley eligible for termination without regard to the RIF process.  Nothing in the evidence adduced by the plaintiff suggests a retaliatory motive with respect to any of the actions taken by Allstate based on Mobley's alleged disability.

### Conclusion

Ms. Balatsoukas may not have been a model of flexibility and understanding as she pushed Mobley (and apparently all the other Allstate employees whom she supervised) to meet performance expectations.  In addition, arguably, she played some role in initially misinterpreting Mobley's situation to involve only FMLA issues, rather than ADA issues.  But Ms. Balatsoukas's actions notwithstanding, in late 2002 and early 2003, Mobley herself was convinced that her physical condition was such that she would be able to pull herself out of her performance problems simply by making changes to her medications.  Thereafter, when it became clear to all involved that Mobley's problems were more than a short term situation amenable to appropriate medical treatment, Balatsoukas was clearly on board in making the necessary efforts to accommodate Mobley, specifically, by allowing Mobley to work in the conference room.

Nothing in the record establishes that Mobley was pushed out the door because of anything other than her poor performance, which positioned her for

inclusion in the broader RIF.  Allstate's accommodation, despite Mobley's personal preferences otherwise, included one of the suggestions made by her doctor and, in fact, it was an option that had proved successful previously in reversing Mobley's performance deficiencies.  Allstate's actions in dealing with Mobley did not run afoul of the ADA, either with respect to the accommodations it made or its RIF policies and procedures or in terms of retaliation against her, and Allstate is therefore entitled to summary judgment on the claims made in Mobley's complaint.

Accordingly, Allstate's Motion for Summary Judgment (Document #45**)** is **GRANTED** and judgment in favor of the Defendant shall issue.

IT IS SO ORDERED.

Date:   09/22/2006

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Kevin W. Betz
BETZ & ASSOCIATES
kbetz@kbetzlaw.com

Susan W. Kline
BAKER & DANIELS
swkline@bakerd.com

Sandra L. Blevins
BETZ & ASSOCIATES
sblevins@betzadvocates.com

Alan L. McLaughlin
BAKER & DANIELS
alan.mclaughlin@bakerd.com